2014 COA 114

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Jacob Roy WILSON, Defendant–Appellant.**

**Court of Appeals No. 11CA1276**

Colorado Court of Appeals, Div. II.

Announced September 11, 2014

John W. Suthers, Attorney General, Patricia R. Van Horn, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Andrea R. Gammell, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE DAILEY

¶ 1 Defendant, Jacob Roy Wilson, appeals the judgments of conviction entered on jury verdicts finding him guilty of two counts of sexual assault (by means of sufficient consequence to cause submission against the victim's will). We affirm the judgments of conviction but remand for correction of the mittimus.

### I. Background

¶ 2 Defendant's convictions arose out of an incident involving an intoxicated woman (A.M.) he met in downtown Denver on St. Patrick's Day. According to A.M., she encountered defendant and his friend after she had lost her phone and could not find her friend. She asked defendant and his friend for help and remembered stopping with the two men to speak with a group of women. Her next memory, however, was of the men pulling her pants down to her knees on a parking garage ramp. She said each man straddled and vaginally penetrated her while she was in a squatting position with her back against the wall; she also said that one of the men also orally penetrated her. She explained that the assault had lasted about ten minutes and ended when the men took cash from her wallet and ran away.

¶ 3 A.M. had suffered injuries to her vaginal area that were consistent with either nonconsensual or consensual intercourse; defendant's DNA was found on A.M.'s face and neck; and defendant's friend could not be excluded as a source for the mixture of DNA found in A.M.'s underwear.

¶ 4 At trial, defendant did not testify, nor did he present any evidence or witnesses on his behalf. He argued, though, that A.M. had significant gaps in her memory; that the physical evidence supported the conclusion that, while intoxicated, she had consensual sex with him and his friend; that, upon realizing she was involved in an activity which, under normal circumstances, she would not involve herself in (i.e., sex with strangers), A.M. filled in the gaps of her memory to come up with an explanation for (and details about) her involvement in that activity; and that that explanation was that the sex must not have been consensual on her part.

¶ 5 To support his argument, defendant pointed to inconsistencies in her story over time as well as to evidence which, he said, contradicted her story, including (1) parking garage surveillance videos showing, at one point, A.M. supposedly pulling defendant's friend into the elevator,[1] and, overall, defendant and his friend being with A.M. in the parking garage for forty-four minutes, much longer than A.M.'s ten-minute recollection of the assault;[2] and (2) evidence that, when she emerged from the parking garage, she "looked like she'd been rolled [o]n the ground" and was wearing socks with dirty bottoms. (This latter circumstance, defendant argued, suggested that A.M. had consensually removed her shoes and pants before laying on the ground to have sex rather than, as she related at trial, having been sexually assaulted with her back against a wall.)

¶ 6 Although it acquitted defendant of robbery, the jury convicted him of the two counts of sexual assault, and the trial court sentenced him to a term of sixteen years to life imprisonment in the custody of the Department of Corrections.

## II. Challenges for Cause

¶ 7 Defendant contends that the trial court erred in denying one of his challenges for cause and granting two of the prosecution's challenges for cause. We disagree.

¶ 8 Section 16–10–103(1)(j), C.R.S.2013, and Crim. P. 24(b)(1)(X) require disqualification of a juror if his or her state of mind manifests a bias for or against either side, unless the court is satisfied that the juror will render an impartial verdict based solely upon the evidence and instructions of the court. See Morrison v. People, 19 P.3d 668, 672 (Colo.2000); People v. Shreck, 107 P.3d 1048, 1057 (Colo.App.2004).

■■ ¶ 9 A prospective juror who makes a statement evincing bias may nonetheless serve as a juror so long as he or she agrees to set aside any preconceived notions and make a decision based on the evidence and the court's instructions. People v. Phillips,

219 P.3d 798, 801 (Colo.App.2009). But if the juror's statements do not demonstrate the sort of enmity or bias that warrants dismissal under the law, the court may deny the challenge for cause without further inquiry. People v. Merrow, 181 P.3d 319, 321 (Colo. App.2007).

■■ ¶ 10 We give great deference to the trial court's determination of a challenge for cause, because such decisions turn on an assessment of the potential juror's credibility, demeanor, and sincerity in explaining his or her state of mind. Because the trial court is in a better position to evaluate these factors than a reviewing court, we will overturn a trial court's decision concerning a challenge for cause only upon an affirmative showing by the defendant that the court abused its discretion. Shreck, 107 P.3d at 1057.

¶ 11 A trial court abuses its discretion in this context only if there is no evidence in the record to support its decision. People v. Richardson, 58 P.3d 1039, 1042 (Colo.App. 2002); see also Carrillo v. People, 974 P.2d 478, 486 (Colo.1999) (holding that an appellate court must examine the entire voir dire of the prospective juror).

¶ 12 Here, all three of the challenged jurors expressed a possible bias:

- Juror R, who had worked for eight years as "a counselor for survivors of domestic violence and sexual assault" and had several friends who were sexual assault survivors, expressed some concern about her ability to be fair;

- Juror W indicated that he "possibly" had a bias against the prosecution; he had had "bad experiences with the justice system" because he had been arrested himself and had seen a friend plead guilty to a sexual assault he did not commit just to minimize jail time; that he had seen "a lot of unfairness and bias in the system" in his friend's case; and, that he had "some biases around" his knowledge of "how t[he] process works,

---

1. The prosecution took a different view of the very same scene, portraying it as depicting the friend as "grabb[ing]" A.M. and "physically pushing" her into the elevator.

2. There was apparently, however, no camera covering the area of the parking garage in which the sexual assaults were alleged to have occurred.

up until the time [the case] comes to the courtroom"; and,

- Juror S believed she had been unjustly convicted of assaulting another woman and that her case had been "pushed right along" by the prosecutor, who she felt was "just trying to move people through" court proceedings; and that, because the report of the police officer handling her case was "one-sided" and "very biased," she would "probably be a little biased" in evaluating the testimony of a Denver police officer (She would, she said, "definitely" have "a tougher time" with an officer's testimony than with that of "a guy that ran a florist shop.").

¶ 13 The trial court denied defendant's challenge for cause to Juror R but granted the prosecution's challenges for cause to Jurors W and S.

### A. Juror R

¶ 14 The court found that, although Juror R was "expressing real concern about her ability to be fair," she was

not a juror who had—at least exhibits emotional responses on this subject. There was nothing about the experience of anyone she knew that came to the fore here.

This is a woman who had professional experience in the area, and is aware of that, and is aware of the effect it could have, and well aware of the obligations as a juror. I think she has a solid intellectual understanding of what her role is. I don't think there is any indication she is emotionally unable to perform that role.

¶ 15 In this regard, the record reflects:

- When asked by the prosecutor how she felt about the presumption of innocence, she stated it "is the bedrock of the judicial system, everyone—until the jury says you are guilty, [you] are innocent";
- She understood that the prosecution had the burden of proof and "the defense doesn't have to do anything";
- She "believe[d] it [was her] duty to be as objective as possible. [She did] a lot of things in [her] history that might bring it into question, but [she] would do [her] best to perform as a responsible citizen";

- She recognized that her "role here [as a juror] isn't to be a counselor to the victim, [her] role here is completely different";
- She stated that, although she could not guarantee it, she was going to try to be fair; and
- She resisted what she perceived as defense counsel's attempt to get her to say she could not be fair, saying, ultimately, Honestly, yeah, there are probably cases better for me to be on, but I also think that given some of my training, it is also good for me to be here, because I bring some professional expertise.

¶ 16 The record thus reflects that, although her previous work with sexual assault victims was a source of potential bias, Juror R repeatedly stated that she would try to decide the case fairly. Because she indicated that she thought she could fulfill her duties as a fair and impartial juror, we discern no error in the court's ruling. See Phillips, 219 P.3d at 802 ("The mere fact that a juror's answers to questions are equivocating or contradictory is not enough, by itself, to overturn the denial of a challenge for cause. It is in exactly these types of situations that the trial court has the greatest amount of discretion.") (citation omitted); see also People v. Doubleday, 2012 COA 141, ¶¶ 47, 51, 54–57 (Denial of challenge for cause to prospective juror who, in response to whether she could follow the law, be fair and impartial, and rely on the evidence presented at trial to reach her verdict, responded either "I don't know. I would hope so," or "I think I can do that"; and, in response to whether she would be able to keep an open mind, said, "I don't know. I hope so," upheld) (cert. granted on other grounds Oct. 7, 2013); Richardson, 58 P.3d at 1044 (Denial of defendant's challenge for cause in a murder case to a juror who indicated that she "would like to think" and "would hope that [she] could" set aside her personal traumatic experience with a family friend's murder, although she could make "no guarantees" upheld; at no time did she state that she could not or would not act impartially or that she had a bias against either side).

¶ 17 In so concluding, we necessarily reject defendant's reliance on People v. Roldan, 353

P.3d 387, 2011 WL 174248 (Colo.App. No. 08CA2487, Jan. 20, 2011), *reversed on other grounds,* 2014 CO 22, 322 P.3d 922, where, when asked if she could put aside her bias in favor of police officers, the prospective juror responded, "I think I probably can." The record in that case "suggest[ed] that [the juror] doubted her capacity for fairness," because she would "most likely" accept a police officer's statements as more truthful than another person's as a result of her husband, brother, and cousin all being police officers. *Id.* In this case, the source of Juror R's potential bias was not of as intimately a personal nature as it was for the potential juror in *Roldan*; nor were Juror R's responses about being fair as doubtful as those of the potential juror in *Roldan:*

¶ 18 We are also not persuaded by defendant's argument that "[t]he arbitrariness of the court's ruling with respect to Juror R readily appears when viewed in connection with the court's rulings on Jurors W and S." An appearance of inconsistency among challenges for cause is not an accurate indication of whether a court abused its discretion. *See State v. Baca,* 111 N.M. 270, 804 P.2d 1089, 1094 (App.1990) (noting that it is difficult to demonstrate inconsistency among rulings on challenges for cause because each challenge requires the trial court to evaluate the potential juror's "demeanor, credibility, and other intangible matters").

### B. Jurors W and S

¶ 19 We acknowledge that, as was the case with Juror R, nothing Jurors W and S said demonstrated, on its face, an unequivocal and unremitting bias in favor of one side or against the other. But their assurances of attempted impartiality left something to be desired, in comparison with those of Juror R:

- Although Juror W did not think his arrest would affect his ability to serve on the jury, he "c[ould]n't honestly say yes or no, [that the way his friend had been treated] won't come into consideration"; and,
- Although Juror S said she would not "disbelieve" a police officer's testimony simply because it came from an officer, she also said she would be more "apprehensive" and "cautious" about testimony from an officer.

¶ 20 With respect to Juror W, the court said:

My concern with [Juror W], is not that he can't separate out the facts of this friend's case from this case, [but] that he believes our system of justice is one in which defendants are railroaded, in which they plead guilty to things they have not done, because they are exposed to terrible penalties, if they don't do that. That's the area that was on his mind when he said he has possible bias against the prosecution. That's why I think he indicated that he might well hold the People to a higher standard of proof. And I am, based on his responses, very concerned about his ability to follow the Court's instruction in this case.

¶ 21 With respect to Juror S, the court removed her because she was "candid" about the fact that she evaluates the testimony of police officers differently from that of other witnesses.

¶ 22 Because the record reflects grounds upon which to believe Jurors W and S may have biases, and because it was for the court to determine the sincerity and credibility of any assurances to the contrary, the court acted within its discretion in removing them based on its conclusion that it was not satisfied that they would render an impartial verdict. *See People v. Mack,* 33 P.3d 1211, 1217–18 (Colo.App.2001) (Trial court acted within its discretion in granting prosecution's challenge for cause to juror who, despite assuring the court that he could be objective, also said he "would be very harsh on how [the prosecution] proved [its] case," did not think the drug laws were fair, and had seen drug prosecutions "destroy people's lives."); *People v. Schmidt,* 885 P.2d 312, 315 (Colo.App.1994) (Trial court did not abuse its discretion in granting prosecution's challenge for cause to juror who, despite saying "she would 'probably not' be unfair and, if selected, would not render a verdict contrary to the law and evidence," expressed a discomfort acting as a juror in a sexual assault case because of her religious beliefs.); *see also People v. Sandoval,* 733 P.2d 319, 321 (Colo. 1987) ("[A] fair and impartial juror must be free from stereotypical biases, whether they

be directed toward automatic acceptance or automatic rejection of testimony based solely on the status of a witness.").

### C. Harmless Error

¶ 23 Even if the court erred with respect to one or even all of the challenges for cause, reversal is not required. To show prejudice sufficient to require reversal, "the defendant ordinarily must show that a biased or incompetent juror participated in deciding his guilt." *People v. Wise*, 2014 COA 83, ¶ 28. Because defendant did not challenge for cause any jurors who ultimately sat on the jury, any error would be harmless. *See id.*

### III. Impeachment of A.M.

¶ 24 Next, defendant contends that the trial court erred in not allowing him to impeach A.M.'s testimony that she had truthfully answered all of a detective's questions in an interview. We disagree.

¶ 25 During cross-examination, defense counsel asked A.M. about her interview with the detective. In response to defense counsel's leading questions, A.M. confirmed that she had described to him the details of what happened during the assault. She also confirmed that he asked her questions about things that happened prior to the assault and that she "gave truthful answers to all of his questions."

¶ 26 At this point, defense counsel approached the bench and, citing CRE 608(b), requested permission to examine A.M. about her not being truthful during the interview "about having been arrested for narcotics, and what those narcotics were." The trial court denied counsel's request, ruling that A.M.'s narcotics arrest was not probative of her "veracity or truthfulness" and noting that she "was ultimately never charged" or convicted of possessing narcotics.

¶ 27 Defense counsel explained that she wanted to question A.M. "not so much [about] the arrest itself," but about her untruthful answers to specific questions during the interview. The court responded that "the only instance that you have given me is having to do with the narcotics. It's a backdoor way of getting ... to what ... would

not be permitted under Rule 608(b), so the request is denied."

¶ 28 Subsequently, defense counsel sought permission to cross-examine the detective about "whether or not [A.M.] was completely forthcoming in all of her answers to his questions." She did not, she said, intend to ask what those questions were; however, she believed that A.M.'s "truthfulness, or her forthrightness with the detective during the course of the interview is relevant." She indicated that her request, at this point, was not based on CRE 608(b),[3] but based on the fact that A.M. had testified "that she answered all of [the detective's] questions truthfully.... I believe that if [the detective] were asked, he would indicate that she was not entirely forthcoming to the answers to all of his questions."

¶ 29 The court precluded the desired questioning of the detective, ruling, in pertinent part:

> I think this is trying to take a drug issue—while she may or may not to [sic] take a drug issue and bring it in, under 608(b); furthermore, under Rule 401, 403, if I permit that questioning, that leaves the inevitable question of: What was she untruthful about? Something on the [date of the assault] or some other issue? And this invites jury speculation.
>
> And I think that, then, both sides were left with either a jury speculating about what was—or having to get into drug use or the arrest for drugs. So I see it as a situation where, under 401 and 403, even to the extent that this may be an instance that could be encompassed by [*People v.*] Segovia, [196 P.3d 1126 (Colo.2008),] which I really don't believe, but even if it was, then it would—then under 401 and 403, it would simply invite speculation.

¶ 30 On appeal, defendant contends that the trial court violated his constitutional right of confrontation by unduly restricting his right to cross-examine witnesses, in contravention of CRE 608(b) and his independent right to contradict A.M.'s trial testimony.

¶ 31 Initially, we note that, by her requests, defense counsel properly preserved

---

3. She said: "I'm not sure [CRE 608(b)] applies. I'm not satisfied with subsection B[sic]."

defendant's claim of error under CRE 608(b) and (with respect to the questioning of the detective) the doctrine of impeachment by contradiction. However, because defense counsel never asserted in the trial court that any constitutional right was implicated, we apply the plain error standard of review to defendant's Confrontation Clause claim. *See People v. Vigil,* 127 P.3d 916, 929 (Colo.2006); *People v. Brown,* 218 P.3d 733, 740 (Colo. App.2009), *aff'd,* 239 P.3d 764 (Colo.2010). We perceive no error, much less plain error.

### A. CRE 608(b)

¶ 32 Under CRE 608(b), a witness may be cross-examined about specific instances of conduct that are probative of the witness's character for truthfulness or untruthfulness, but extrinsic evidence (*e.g.,* evidence from another witness) may not be used to prove that conduct. *Segovia,* 196 P.3d at 1130. Consequently, under a CRE 608(b) analysis, we are concerned only with the proposed cross-examination of A.M., and not with that of the detective.

¶ 33 In *Segovia,* the supreme court recognized that providing false information to a police officer is, for CRE 608(b) purposes, probative of a witness's untruthfulness. 196 P.3d at 1130; *see also People v. Garcia,* 17 P.3d 820, 829 (Colo.App.2000) (court did not abuse its discretion in allowing the defendant to inquire into the circumstances of a witness's misdemeanor conviction for giving false information to police without getting into the conviction itself). Thus, A.M.'s allegedly untruthful response to the detective would qualify for inquiry under CRE 608(b).

¶ 34 A trial court has discretion, however, to exclude CRE 608(b) evidence on CRE 403 grounds. *Segovia,* 196 P.3d at 1132 (proposed inquiries of a witness under CRE 608(b) are subject to CRE 403 limitations); *see also People v. Lesslie,* 939 P.2d 443, 452 (Colo.App.1996) ("[I]t also was well within [the court's] discretion to exclude [CRE 608(b) evidence] as being more prejudicial than probative.").

¶ 35 " '[D]iscretion is abused only where no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.' " *People v. Hoover,* 165 P.3d 784, 802 (Colo.App.2006) (quoting *State v. Heywood,* 245 Kan. 615, 783 P.2d 890, 894 (1989)); *see People v. Acosta,* 2014 COA 82, ¶ 27, 338 P.3d 472 ("A trial court abuses its discretion if its decision is *manifestly* arbitrary, unreasonable, or unfair.") (emphasis added); *People v. Rhea,* 2014 COA 60, ¶ 58, 349 P.3d 280 ("[U]nder the abuse of discretion standard, the test is not 'whether we would have reached a different result, but rather, whether the trial court's decision fell within a range of reasonable options.' ") (quoting *People v. Salazar,* 2012 CO 20, ¶ 32, 272 P.3d 1067 (Bender, C.J., dissenting)).

¶ 36 A trial court should "exclude evidence that has little bearing on credibility, places undue emphasis on collateral matters, or has the potential to confuse the jury." *People v. Knight,* 167 P.3d 147, 153 (Colo. App.2006) (applying CRE 608(b) in conjunction with CRE 403). "A matter is considered collateral when it has no independent significance to the case and thus would not be independently provable regardless of the impeachment. In contrast, a matter is not collateral if it would have been independently provable regardless of the impeachment." *Banek v. Thomas,* 733 P.2d 1171, 1178 n.7 (Colo.1986) (citations omitted).[4]

¶ 37 As the court noted, defendant's proposed inquiry of A.M. raised the issue of her narcotics arrest. Notably, defendant did not argue before the trial court, and has not argued on appeal, that A.M.'s arrest had any independent significance, i.e., demonstrating

---

4. There are three generally recognized categories of noncollateral facts: facts that are admissible to prove substantive issues in the case; facts that are admissible to impeach or disqualify the witness on grounds other than contradiction (*e.g.,* bias); and any part of the witness's account of the background and circumstances of a material transaction which as a matter of human experience he would not have been mistaken about if his story were true (*e.g.,* the fact that the accident at issue occurred during a blizzard on a moonless night, rather than on a sunny day as the witness described). *See* 27 Charles Alan Wright, Kenneth W. Graham, Jr., Victor James Gold & Michael H. Graham, *Federal Practice & Procedure: Federal Rules of Evidence* § 6096, at 659–62 (2d ed. 2014).

her motive to testify falsely. *See Kinney v. People,* 187 P.3d 548, 559 (Colo.2008) ("[T]he trial court should allow broad cross-examination regarding the witness's motive for testifying whenever the witness has a pending case and his or her testimony against the defendant *might be influenced* by a promise of, or hope or expectation of, immunity or leniency with respect to the pending charges against him, as a consideration for testifying against the defendant." (internal quotation marks omitted)).

¶ 38 Thus, that A.M. was arrested on another occasion for a narcotics offense would not have been independently admissible in the present case. *See People v. Pratt,* 759 P.2d 676, 682 (Colo.1988) ("[A]n arrest alone is not admissible to impeach a witness' credibility."); *Lesslie,* 939 P.2d at 452 (Because unproven accusations of criminal behavior do not, by themselves, raise an inference of improper actions, "an arrest or a pending criminal charge generally is an improper subject for impeachment.").

¶ 39 Because the subject of the narcotics arrest raised a collateral issue, the trial court acted within the range of permissible choices in precluding defendant from inquiring of A.M. whether she had been truthful to the detective on that subject. *See generally People v. Taylor,* 190 Colo. 210, 212–13, 545 P.2d 703, 705 (1976) (Trial court should "exercise its sound discretion to preclude inquiries … which would have little effect on the witness' credibility but would substantially impugn his moral character"); *see also People v. Jimenez,* 217 P.3d 841, 862 (Colo.App.2008) (Although evidence that the witness contradicted his previously stated reason for engaging in an altercation while in prison had impeachment value, it was "not central to this case or involving the events at issue in this case" and was properly excluded from cross-examination.); *People v. Rincon,* 140 P.3d 976, 981 (Colo.App.2005) (trial court was within its discretion to prohibit cross-examination regarding, among other things, the witness's untruthful statements to her parole officer

about taking prenatal vitamins during pregnancy, which would have injected collateral issues into the case); *People v. Ashton,* 661 P.2d 291, 296 (Colo.App.1982) (trial court correctly prevented cross-examination on witness's prior inconsistent statement to police that raised the collateral matter of the witness's drug dealing).

### B.   Contradicting A.M.'s Trial Testimony

¶ 40 In the trial court, defense counsel asserted that she was entitled to introduce evidence from the detective that would contradict A.M.'s testimony that she had been completely truthful with him.

¶ 41 "Impeachment by contradiction consists of counterproof that something said by the witness is not accurate. Contradiction may be achieved," as pertinent here, through the "use of extrinsic evidence." 33A Federal Procedure: Lawyers Edition § 80:131, at 222–23 (Thomson West 2003). However, "[e]xtrinsic evidence is generally inadmissible to contradict a witness' testimony on a collateral matter." *People in Interest of K.N.,* 977 P.2d 868, 876 (Colo.1999); see also Federal Procedure: Lawyers Edition § 80:131, at 223 ("[E]xtrinsic impeaching evidence is admissible for contradiction only where the prior testimony being contradicted was itself material to the case at hand rather than collateral. One may not contradict for the sake of contradiction; the evidence must have an independent purpose and an independent ground for admission."); 27 Charles Alan Wright, Kenneth W. Graham, Jr., Victor James Gold & Michael H. Graham, Federal Practice & Procedure: Federal Rules of Evidence § 6096, at 659 (2d ed. 2014) ("Evidence extrinsic to a witness's testimony is inadmissible to contradict that witness on a collateral matter.").[5]

¶ 42 As noted above, the ultimate object of defendant's desired questioning—whether A.M. had been truthful with respect to her previous arrest for a narcotics offense—was

---

5. There is one exception to this rule: extrinsic evidence is admissible to contradict a criminal defendant's testimony about a collateral matter. *See Federal Practice & Procedure* § 6096, at 655; *see also People v. Thomas,* 2014 COA 64, ¶ 49, 345 P.3d 959 (" '[T]estimony on direct by a de-

fendant in a criminal case can open the door to admission of extrinsic evidence to contradict even though the contradictory evidence is otherwise inadmissible, and, thus, collateral.' ") (quoting *Federal Practice & Procedure* § 6096).

a collateral matter. Consequently, the trial court acted within its discretion to prohibit defendant from inquiring about it.

¶ 43 Nor, in our view, did the court abuse its discretion in precluding defendant's attempt to elicit from the detective evidence that A.M. had been untruthful without identifying the precise subject of that untruthfulness. In the first instance, such an inquiry would be improper because testimony that another witness or the defendant is or was being truthful or untruthful on a particular occasion is inadmissible. See *Liggett v. People*, 135 P.3d 725, 731 (Colo.2006) (questioning a witness about whether other witnesses "were ... lying" is improper). In the second instance, as the court stated, such an inquiry would have served no purpose but to cause the jury to speculate as to what A.M. had been untruthful about. See *Knight*, 167 P.3d at 153 (court may exclude, under CRE 403, a speculative line of inquiry); see also *United States v. Robbins*, 197 F.3d 829, 845 (7th Cir.1999) (because the district court perceived the question at issue as one that would have caused the jury to speculate, it properly limited cross-examination under Fed.R.Evid. 403); *United States v. Atwell*, 766 F.2d 416, 420 (10th Cir.1985) (finding no abuse of discretion in limiting cross-examination regarding credibility under Fed.R.Evid. 403 to avoid jury confusion).

¶ 44 Because defendant's proposed inquiry raised the prospect of either unduly maligning the character of A.M. or leaving the jury to speculate about what A.M. may have lied about, we perceive no abuse of the court's discretion in precluding it.[6]

### C. Confrontation

¶ 45 The right to confront and cross-examine witnesses is not absolute. See *People v. Saiz*, 32 P.3d 441, 449 (Colo.2001). While a trial court may not limit excessively a defendant's cross-examination concerning a witness's bias, prejudice, or motive for testi-

fying, it "has wide latitude, insofar as the Confrontation Clause is concerned, to place reasonable limits on cross-examination" pursuant to CRE 403. *Merritt v. People*, 842 P.2d 162, 166 (Colo.1992); see *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (A trial court retains discretion "to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues ... or interrogation that is repetitive or only marginally relevant.").

¶ 46 Having concluded that the trial court acted within its discretion to preclude the questioning of A.M. or the detective on collateral matters, we discern no violation of defendant's constitutional right to confront adverse witnesses. See *People v. Hogan*, 114 P.3d 42, 55 (Colo.App.2004) (upholding, consistent with confrontation clause rights, limitation on cross-examination on CRE 403 grounds); see also *People v. Greenberger*, 58 Cal.App.4th 298, 68 Cal.Rptr.2d 61, 91 (1997) ("Exclusion of impeaching evidence on collateral matters which has only slight probative value on the issue of veracity does not infringe on the defendant's right of confrontation."); *People v. Bell*, No. 304893, 2012 WL 2946685, at *5 (Mich.Ct.App. July 19, 2012) (unpublished opinion) (" 'Cross-examination may be denied with respect to collateral matters bearing only on general credibility' without offending the Sixth Amendment guarantee to confront one's accusers." (quoting *People v. Canter*, 197 Mich.App. 550, 496 N.W.2d 336, 343 (1992)) (footnote omitted)).

### IV. Prosecutorial Misconduct

¶ 47 We also reject defendant's contention that reversal is required because of prosecutorial misconduct in closing argument.

¶ 48 On appeal, defendant argues that the prosecutor improperly (1) expressed her per-

---

6. In reaching our decision, we necessarily reject, as misplaced, defendant's reliance on impeachment cases that did not involve collateral matters. *See, e.g., Banek v. Thomas*, 733 P.2d 1171, 1178 (Colo.1986) (in excessive force suit against sheriff's deputies where the plaintiff testified he offered no resistance, his prior conviction for misdemeanor resisting arrest should have been admitted to impeach his credibility); *People v.* *Hall*, 107 P.3d 1073, 1076 (Colo.App.2004) (in vehicular homicide case, the defendant should have been allowed to contradict witness's testimony that she would have corrected anyone who stated she was the one driving at the time of the crash with evidence that she was present during a conversation when she was accused of being the driver and did not deny it).

sonal opinion as to A. M.'s truthfulness and (2) encouraged members of the jury to confirm the plausibility of A.M.'s story based on things other than the evidence presented at trial. Because, however, defendant did not object to these comments in the trial court, reversal is warranted only upon a finding of plain error. *See People v. Ujaama*, 2012 COA 36, ¶¶ 37–38, 302 P.3d 296.

¶ 49 To qualify as plain error, an error must be both "obvious and substantial." *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116. By that, we mean that an error must be so clear-cut that a trial judge should have been able to avoid it without benefit of objection, *People v. Pollard*, 2013 COA 31, ¶ 39, 307 P.3d 1124, and that it must be "seriously prejudicial," that is, it must have so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the defendant's conviction. *Ujaama*, ¶ 43; *see also Hagos*, ¶ 14.

¶ 50 Prosecutorial misconduct in closing argument rarely constitutes plain error. *Ujaama*, ¶ 70.

### A. A.M.'s Truthfulness

¶ 51 Defendant argues that the prosecutor improperly vouched for A.M.'s truthfulness by telling the jury that A.M. "told you the truth" and gave "very core truthful details."

¶ 52 "[A] prosecutor cannot communicate her [personal] opinion on the truth or falsity of witness testimony during final argument." *Domingo–Gomez v. People*, 125 P.3d 1043, 1049 (Colo.2005). A prosecutor may, however, draw reasonable inferences from the evidence as to the credibility of witnesses. *Wilson v. People*, 743 P.2d 415, 418 (Colo.1987). Counsel may also properly comment on how well and in what manner a witness's testimony measures up to the tests of credibility on which the jury is instructed. *People v. Constant*, 645 P.2d 843, 846 (Colo. 1982).

¶ 53 "In cases that turn on the credibility of witness testimony, the line between argument about whether the jury can rely on the testimony of witnesses and improper expressions of personal opinion becomes hard to draw." *Domingo–Gomez*, 125 P.3d at 1051. Ultimately, "[w]hether a statement improperly expresses the personal opinion of a prosecutor or is an acceptable comment on the credibility of witnesses, requires a reviewing court to consider the language used, the context in which the statement was made, and any other relevant factors." *Id.*

¶ 54 In her initial closing argument, the prosecutor said:

> [A]sk yourselves this big question: What motivation does she have to make this up? You haven't heard a thing. What motivation does she have to come in? There is no evidence, because there is none. *She came in and told you the truth.*
>
> . . .
>
> What is her motivation to go through, starting with the SANE exam which was voluntary, and ending in the culmination with her in this courtroom? What is the motivation? There is none. And why not make up something a lot better if she's going to do it, right? I mean, why talk to you about pants coming down around her knees? Why not say: They threw me down; they stripped off all my clothes? *She's giving you those very core, truthful details that she remembers.* And some of it's not pretty. She has to [sic] admitted, "No, I don't remember what we were talking about. No, I don't remember one of those bars. No, I don't remember a lot of this stuff." Why not fill that in if she's not being honest with you? It adds to her credibility. And even after all of this, she continues to be cooperative.

(Emphases added).

¶ 55 We perceive no error. The context in which the prosecutor used the potentially problematic words "truth" and "truthful"— i.e., (1) that there was no evidence that A.M. had a motive to lie and (2) that A.M.'s ability to remember specific core details while admitting that she was unable to remember others indicated she was telling the truth— reveals that the prosecutor was drawing reasonable inferences from the evidence rather than professing her personal opinion as to A.M.'s veracity. *See id.* (Although the language used by the prosecutor—that defendant "did not tell you the truth" and "[h]e was not truthful with you"—"was susceptible to being considered a personal opinion," the

context in which the comments were made indicated that they were "reasonable inferences stemming directly from the facts in evidence."); *People v. Davis*, 312 P.3d 193, 201 (Colo.App.2010) (Prosecutor did not improperly interject personal opinion where his comments, "Can you believe [E.W.]? Yes," "[W.C.]'s description on that DVD has a ring of truth," and "[W.C.] is credible," were inferences about the truthfulness of the witnesses' testimony "anchored in evidence.").[7]

¶ 56 Moreover, even if the comments were improper, they did not so undermine the trial's fundamental fairness as to cast serious doubt on the reliability of the verdicts. The comments made up a small part of the prosecutor's closing argument, during which the prosecutor fairly summarized the evidence, and provided reasons, based on the evidence, why the jury should believe A.M.'s allegations. Further, the trial court provided the jury with a proper credibility instruction, and, at one point during closing, reminded the jury that the arguments of counsel were not evidence.

¶ 57 Under these circumstances, plain error did not occur. *See People v. Villa*, 240 P.3d 343, 358–59 (Colo.App.2009) (Under some circumstances similar to those in the present case, court concluded that plain error was not occasioned by prosecutor's remarks that "[w]hat [the victim] said happened to her is the truth" and "this three-year-old child was telling the truth."); *cf. Crider v. People*, 186 P.3d 39, 42–43 (Colo.2008) (prosecutor's improper characterizations of defendant as lying or as having lied, and of portions of defendant's testimony as being lies, were harmless where, because each characterization was directly related to specific physical evidence, they could not have been misunderstood to be an expression of personal opinion about the defendant's veracity or a suggestion that the prosecutor was privy to information of which the jury was unaware).

### B. Confirming the Plausibility of A.M.'s Testimony

¶ 58 Defendant also argues that, in rebuttal closing, the prosecutor improperly suggested matters external to those presented in court that female jurors should consider in deciding whether A.M.'s story was plausible:

I want you to think about the vaginal trauma [A.M.] had. Here's the hard conversation: You go back in that jury room, and you have nine women currently on this jury. Why don't you have a hard conversation about how many of them have suffered vaginal trauma from a consensual sexual encounter. You have a hard conversation about that.

You're here to have hard conversations. You were asked about—[defense counsel], in closing, talks about the relative positions of these people. Really? You think about her pants down around her knees. You need to go in that bathroom and take in [sic] your pants down to your knees. And you see, if they wanted to, could jam an erect penis into a woman's vagina? You bet they can. They did. DNA evidence tells you exactly that.

¶ 59 Initially, defendant asserts that the prosecutor's suggestion that the jurors have a "hard conversation" about their own sexual experiences played to the passions of the jury and likely made them uncomfortable. Because of the role jurors play in our justice system, they can be expected to be "uncomfortable" and to have "hard conversations" about the hard decisions they are required to make: "At times, the decisions we ask jurors to make are particularly difficult and carry with them enormous consequences." *People v. Kasim*, 56 Cal.App.4th 1360, 66 Cal. Rptr.2d 494, 505 (1997); *see Moody v. State*, 140 So.3d 700, 701 (Fla.Dist.Ct.App.2014) (Jurors "play[ ] an especially important role in a trial. Whether in the civil or criminal

---

7. *See also, e.g., People v. Cole*, 365 Ill.Dec. 90, 977 N.E.2d 1189, 1196 (Ill.App.Ct.2012) (prosecutor's comments during closing argument that state witness was credible, was honest, and told the truth, were not improper because they were based on the evidence); *Commonwealth v. Koumaris*, 440 Mass. 405, 799 N.E.2d 89, 96–97 (2003) (Prosecutor's statements that witness had "told you the truth" and "[t]here's credibility to what [the witness] said on that [witness] stand," did not improperly vouch for witness's credibility, but were, instead, a proper defense of witness's credibility, in context of asserting witness's lack of motive to lie, after defense counsel had attacked witness's credibility during cross-examination and closing arguments.).

context, jurors make difficult decisions that have a profound impact on the parties' lives."); *see also Wiersum v. Harder*, 316 P.3d 557, 575 (Alaska 2013) (Stowers, J., concurring in part and dissenting in part) ("Juries are the voice of reason, conscience, and community, and we trust them to make difficult decisions touching upon life and death.").

¶ 60 Consequently, we perceive no error in the prosecutor's phrasing her requests in terms of asking the jury to "have a hard conversation."

¶ 61 The issue, in our view, is whether the objects of the prosecutor's requests were proper—that is, whether the prosecution could ask female jurors to (1) consider their life experiences in determining whether A.M.'s vaginal trauma was attributable to consensual or nonconsensual sex and (2) conduct a bathroom "experiment" to determine if a sex assault could have occurred as A.M. said it did.

¶ 62 We conclude that the prosecutor could properly make the first request, and that plain error did not occur as a result of the second.

¶ 63 We base our conclusion, with regard to the vaginal trauma issue, on the undisputable proposition that "jurors may apply their general knowledge and everyday experience when deciding cases." *Kendrick v. Pippin*, 252 P.3d 1052, 1064 (Colo.2011), *abrogated on other grounds by Bedor v. Johnson*, 2013 CO 4, ¶¶ 21–22, 292 P.3d 924; *People v. Holt*, 266 P.3d 442, 444–45 (Colo.App.2011) ("[J]urors may apply their general knowledge and everyday life experience in deliberations."). In asking the jury to evaluate the evidence, based on the experience of some of its members, the prosecutor was not asking the jury to decide the case on impermissible grounds. *See Kendrick*, 252 P.3d at 1064 (" '[T]he concept of "extraneous information" does not include the general knowledge a juror brings to court.' ") (quoting *People v. Harlan*, 109 P.3d 616, 636 (Colo.2005) (Rice, J., dissenting)). Indeed, the court instructed the jury to "consider all the evidence in the light of your observations and experience in life."

¶ 64 As to the bathroom "experiment," the issue is whether the prosecutor invited the jury do something that was improper. She did.

¶ 65 " 'A jury cannot properly consider information from an outside source, not presented during the course of the trial.' " *People v. Thompson*, 121 P.3d 273, 277 (Colo. App.2005) (citations omitted) (quoting *Pratt v. Rocky Mountain Natural Gas Co.*, 805 P.2d 1144, 1147 (Colo.App.1990)); *see also Moore v. Mitchell*, 708 F.3d 760, 805–06 (6th Cir.2013) ("Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to a jury that considers only the evidence presented at trial and the right to confront the evidence against him."); *Payne v. Harrington*, No. C 11–00960 CRB, 2012 WL 909618, at *3 (N.D.Cal. Mar. 16, 2012) (unpublished decision) ("The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence presented at trial. . . . This 'necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' " (quoting in part *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965))).

¶ 66 Juror experiments may result in the discovery of new evidence in addition to that which was presented in court. *See generally People v. Collins*, 49 Cal.4th 175, 110 Cal.Rptr.3d 384, 232 P.3d 32, 84–88 (2010). Not every juror experiment, however, constitutes misconduct. *Id.*, 110 Cal.Rptr.3d 384, 232 P.3d at 89.

[T]he relevant inquiry is whether the experiment or investigation made by the jury can be said to be within the scope or purview of the evidence introduced at trial. If so, the actions of the jurors are not improper. It is only if their activity is the equivalent of the reception of additional evidence that they may be said to have engaged in misconduct.

*Thompson*, 121 P.3d at 277 (quoting *Pratt*, 805 P.2d at 1147).

¶ 67 In determining whether a jury "experiment" would be improper, we recognize that

[j]urors do not live in capsules. It is not expected that jurors should leave their common sense and cognitive functions at the door before entering the jury room. Nor is it expected that jurors should not apply their own knowledge, experience, and perceptions acquired in the everyday affairs of life to reach a verdict.

. . .

[Thus,] reenactments in the jury room based on the jury's recollection of the testimony are usually allowed as an application of the jury's common sense and deductive reasoning to determine the truth of the facts in dispute. . . .

Bennett L. Gershman, *Contaminating the Verdict: The Problem of Juror Misconduct,* 50 S.D. L.Rev. 322, 331, 333 (2005); *see State v. Pease,* 163 P.3d 985, 989 (Alaska Ct.App. 2007) ("Courts have repeatedly upheld jurors' efforts to test the credibility or plausibility of trial testimony by experimenting with items of physical evidence admitted during the trial, or by re-enacting the events or conditions described by witnesses."); *see also, e.g., United States v. Abeyta,* 27 F.3d 470, 477 (10th Cir.1994) (In an assault case, a reenactment of the events described by the witnesses using a pocket knife owned by one of the jurors was not improper; and noting, "[t]here is simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room."); *Kurina v. Thieret,* 853 F.2d 1409, 1413–14 (7th Cir.1988) (jury was free, in murder case, to evaluate defense theory by using a cardboard replica of a knife to reenact the crime based on evidence introduced at trial); *Collins,* 110 Cal.Rptr.3d 384, 232 P.3d at 91, 85 (Jurors' reenactment of participants' positions was not improper as it "critically considered the evidence presented" without "invad[ing] a new field" of inquiry.); *State v. Balisok,* 123 Wash.2d 114, 866 P.2d 631, 634 (1994) (A jury's reenactment during deliberations was not misconduct where the jury used only evidence and exhibits admitted at trial and the reenactment applied "common sense and the normal avenues of deductive reasoning.").

¶ 68 "A prosecutor is afforded considerable latitude in replying to an argument by defense counsel." *People v. Wallace,* 97 P.3d 262, 269 (Colo.App.2004). In closing argument, defense counsel pointed to occasions when both he and an investigating detective questioned the viability of A.M.'s account of how she was sexually assaulted. As defense counsel recounted, the detective had told A.M., "It seems physically very difficult," to have been assaulted in the position she claimed she was in; defense counsel had characterized the account as "[p]hysically" not "mak[ing] sense." Ultimately, defense counsel attributed A.M.'s account to her lack of memory as to what actually happened and her creation of details to explain her abnormal behavior.

¶ 69 Under the circumstances, the prosecutor was entitled to respond to defense counsel's argument that A.M.'s account of the assault was essentially physically impossible by inviting the jurors to evaluate this claim of impossibility themselves through a reenactment. *See United States v. Avery,* 717 F.2d 1020, 1026 (6th Cir.1983) (Prosecutor could properly respond to the defendant's argument that "there is no way in the world" he could have moved explosive materials into a crawl space in only three minutes by "ask[ing] the jury to ... recreate portions of the defendant's actions" in the jury room.); *see also Walton v. Keith,* No. CIV-09 –02 81—F, 2010 WL 354131, at *18 (W.D.Okla. Jan. 27, 2010) (unpublished decision) (in response to defense argument, prosecutor could, on rebuttal, invite jury to pull chairs into the commonly known arrangements of seats in a car and consider whether a person bending down to hide items in the back passenger floorboard could be seen).

¶ 70 Assuming the prosecutor's suggestion was otherwise appropriate (and we conclude below that it was not appropriate), a "reenactment" of the sort proposed here might not constitute or result in extraneous evidence, but could constitute the jurors merely taking advantage of their own personal experience and knowledge to test whether A.M.'s description of events was physically possible. *See Pease,* 163 P.3d 985 (jurors could properly test an expert witness's assertion that it was impossible for one person to recognize another at distances of more than 200 feet by taking advantage of an experience afforded

by everyday life—looking out a window in deliberation room to see if they could recognize people at a distance); *Gentry v. State,* 236 Ga.App. 820, 513 S.E.2d 528, 532 (1999) ("[I]t is not improper for the jury to use its common experience to conduct illustrations or experiments which merely examine or verify evidence admitted during the trial."); *People v. Kelly,* 11 A.D.3d 133, 781 N.Y.S.2d 75, 86 (2004) ("[J]urors may conduct a jury room crime reenactment or demonstration provided it involves no more than the jurors' application of everyday experiences, perceptions and common sense to the evidence." (internal quotation marks omitted)).

¶ 71 Defendant asserts that the prosecution's remarks did not actually call for a reenactment of events as described by A.M., and, consequently, created the possibility that extraneous evidence would be injected into the case. According to him, the prosecutor's remarks invited the jury to determine whether a man could " 'jam' an erect penis into the vagina of a juror standing in a bathroom stall with her pants around her knees," a circumstance wholly irrelevant to the facts of the case. However, by referencing "the relative positions of these people," as argued by the defense, the prosecutor provided the context for the proposed reenactment—that the jurors perform it as A.M. described it, squatting with their backs against a wall.

¶ 72 Nonetheless, the prosecutor's request was improper. In the first instance, any suggestion or request by a prosecutor or defense attorney that jurors of either sex remove their clothing and contort their naked bodies into the position that the victim testified she was in at the time of the alleged assault, is patently offensive to the jurors themselves. In the second, it is problematic, to say the least, to invite some members of the jury to re-enact described events, out of the jury room, and out of the presence of the remaining jurors.

¶ 73 Defendant asserts that the prosecutor's invitation here "encouraged the jurors to violate their oath to deliberate only when all twelve jurors were together in the jury room." However, the principle of deliberations by a full jury is not contravened every time one or more of the jurors makes an appraisal of the evidence apart from other

jurors in the case. *See Collins,* 110 Cal. Rptr.3d 384, 232 P.3d at 91 (Juror's conduct in creating diagram on home computer was not "improper because it occurred outside the presence of other jurors. The diagram assisted him in thinking about the evidence at a time when he was permitted to form an opinion about the case. He was not limited to thinking about the case in the deliberation room."); *cf. Bolt v. State,* 428 So.2d 1369 (Ala.Crim.App.1982) (juror's reenactment, at home, of a rape victim's crawling on her back along the carpet so as to verify the victim's testimony did not place new evidence before the jury and did not constitute misconduct).

¶ 74 But merely because a juror may do something outside the presence of other jurors does not mean that a prosecutor may encourage the juror to do so. Indeed, a prosecutor should not encourage jurors to engage in out-of-jury room experiments. *See Moore,* 708 F.3d at 806 (Prosecutor's closing argument was not misconduct because "it did not call for a juror or jurors to experiment and report their findings to the other jurors.").

¶ 75 However, we further conclude, for the following reasons, that the prosecutor's suggestion, though improper, was not plain error.

¶ 76 First, the error was not obvious. For error to be "obvious," the action challenged on appeal must ordinarily contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law. *Pollard,* ¶ 40. Even though we have now determined that the request by the prosecutor was improper, prior to the issuance of this opinion, no statute, well-settled principle, or Colorado case disavows this type of problematic request to a jury. Thus, the argument was not "flagrantly, glaringly, or tremendously improper," for purposes of qualifying as plain error. *See People v. Conyac,* 2014 COA 8M, ¶ 130, ⸺ P.3d ⸺.

¶ 77 Further, the error was not "seriously prejudicial" to defendant. There is no indication in the record that the proposed reenactment was carried out by members of the jury. And, even if had been, it would not, for the reasons and authorities cited above, have resulted in the injection of impermissible ex-

traneous information into the case: the female jurors could assess the evidence in light of their particular knowledge or experiences and bring their assessments to the attention of other jurors. *See Kendrick*, 252 P.3d at 1066 (juror could use her professional background in engineering and mathematics during deliberations to calculate defendant motorist's speed, distance, and reaction time and share those calculations with other jurors).

¶ 78 Because no plain error occurred, reversal is not warranted.

### V. Correction of Mittimus

¶ 79 Finally, defendant contends, the People concede, and we agree, that the mittimus must be corrected. Defendant's mittimus erroneously reflects that he was convicted of four counts of sexual assault. Although, at one point, he was charged with four counts of sexual assault, two of those counts were dismissed before trial; he was convicted on only the remaining two counts. A remand is necessary, then, to allow the trial court to correct the mittimus to reflect the correct number of his convictions for sexual assault. *See People v. Malloy*, 178 P.3d 1283, 1289 (Colo.App.2008) (when the mittimus is incorrect, the case must be remanded to allow the trial court to correct it).

### VI. Conclusion

¶ 80 The judgments of conviction are affirmed, but the case is remanded to the district court for correction of the mittimus consistent with the views expressed in this opinion.

Berger and Márquez *, JJ., concur

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and